**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SHARON DEMERS, KAREN HANCE, and MARK POLITO, individually and on behalf of all others similarly situated,<br><br>           Plaintiffs,<br>v.<br><br>Digi Power X Inc.,<br><br>           Defendant. | **Civil Action No.:**<br><br>**COMPLAINT FOR DAMAGES**<br><br>**DEMAND FOR JURY TRIAL** |

COME NOW Plaintiffs Sharon Demers, Karen Hance, and Mark Polito (Plaintiffs), on behalf of themselves and all others similarly situated, bring this class action complaint against Digi Power X Inc. (Defendant or Digi Power). On personal knowledge of their own circumstances and upon investigation and information and belief of their counsel, Plaintiffs allege the following:

## **INTRODUCTION**

1. The town of North Tonawanda, New York is a close-knit residential community situated between Buffalo and Niagara Falls surrounded by water and natural wildlife. For years, the town's residents, including Plaintiffs, enjoyed the peace and quiet traditionally characteristic of their community.

2. In early 2021, Defendant Digi Power, a cryptocurrency mining company, purchased the local defunct gas power plant to expand its mining operations and reduce its electricity costs (the Mining Facility). "Mining," in this context, refers to the use of computer hardware to try to solve complex math puzzles in the hopes of receiving cryptocurrency, such as Bitcoin, as a reward.

3. Following its acquisition of the plant, Defendant installed thousands of high-processing and energy-intensive computers on the property to mine Bitcoin. Since at least

1

September 2022, Defendant's mining computers have operated and continue to operate nearly twenty-four hours a day, seven days a week.

4.     To cool its mining computers, Defendant has used and continues to use massive industrial-grade fans that run day and night without interruption. These fans produce a loud, droning, and persistent noise – including low-frequency sound that manifests like vibrations – that can be heard and felt throughout Plaintiffs' properties.

5.     Before Defendant started its mining operations at the Mining Facility, Plaintiffs' neighborhood was a peaceful residential area characterized by low ambient noise levels and a tranquil environment. Plaintiffs and their neighbors could comfortably enjoy outdoor activities, view wildlife, rest in their homes without disturbance, and experience nighttime quiet consistent with the area's rural and residential character.

6.     After Defendant commenced its mining operations, however, the character of the neighborhood changed dramatically. The non-stop noise and vibrations generated by Defendant's mining operations are pervasive, inescapable, and unbearable. They interfere with Plaintiffs' ability to sleep, hold conversations, relax indoors and outdoors, or otherwise use and enjoy their property.

7.     As a result of Defendant's mining operations, Plaintiffs have suffered and continue to suffer substantial annoyance, emotional distress, loss of comfort and enjoyment, diminution in the value of their property, and an increased risk of adverse health effects.

## **PARTIES**

8.     Plaintiff Sharon Demers is a resident of New York with an address at 1070 Remington Drive, North Tonawanda, NY 14120. Plaintiff resides in and is affected by the

operations of the cryptocurrency mining facility operated by Defendant in North Tonawanda, New York.

9.      Plaintiff Karen Hance is a resident of New York with an address at 1191 Sherwood Ave North Tonawanda, NY 14120. Plaintiff resides in and is affected by the operations of the cryptocurrency mining facility operated by Defendant in North Tonawanda, New York.

10.     Plaintiff Mark Polito is a resident of New York with an address at 637 Fairmont Ave North Tonawanda, NY 14120. Plaintiff resides in and is affected by the operations of the cryptocurrency mining facility operated by Defendant in North Tonawanda, New York.

11.     Defendant Digi Power X Inc. (Digi Power) is a publicly traded energy and digital infrastructure company that develops and operates energy and data center assets, including modular AI-ready data centers and Bitcoin mining infrastructure. Its registered office is located at 595 Howe St., 10th Floor, Vancouver, BC V6C 2T5. Its principal place of business is located at 218 NW 24th Street, 2nd Floor, Miami, Florida 33127.

12.     Upon information and belief, Digi Power conducts substantial and continuous business within the State of New York, including through its wholly owned subsidiaries and affiliates.

13.     Digi Power operates the Mining Facility located at or near 1070 Erie Avenue, North Tonawanda, New York, within the Northern District of New York.

14.     Upon information and belief, Digi Power owns, leases, controls, manages, and/or operates the North Tonawanda Facility and derives revenue from operations within this District.

## **VENUE AND JURISDICTION**

15.     Subject matter jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because members of the proposed Plaintiff classes are citizens

of states different from Defendant's home state, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

16.     Personal jurisdiction is proper over Defendant because it has engaged in business activities in New York and within Niagara County. Defendant has purposefully directed its activities at the state of New York, including through its operation of the Mining Facility. Due to Defendant's intentional actions, Plaintiffs have foreseeably suffered harm in New York as set forth herein.

17.     Pursuant to 28 U.S.C. § 1391(b)(2), venue is proper in this Court because Defendant has caused harm to class members residing in this District, Plaintiffs reside in this District, and a substantial part of events or omissions giving rise to the claims in suit occurred in this District.

## **GENERAL FACTUAL ALLEGATIONS**

**I.      The North Tonawanda Community.**

18.     North Tonawanda is a residential community located between Buffalo and Niagara Falls, bordered by the Niagara River and the Erie Barge Canal. It is the second-largest city in Niagara County and the fifteenth-largest in New York State, with a population of approximately 31,500 residents.[1]

19.     North Tonawanda is comprised of around 14,700 housing units,[2] with a median property value of $197,200.[3]

---

[1] *About the City of North Tonawanda*, City of North Tonawanda https://www.northtonawanda.org/about (last visited April 6, 2026).
[2] United States Census Bureau, *North Tonawanda City, New York*, https://data.census.gov/profile/North_Tonawanda_city,_New_York?g=160XX00US3653682 (last visited April 6, 2026).
[3] United States census Bureau, *Quick Facts: North Tonawanda City* https://www.census.gov/quickfacts/fact/table/northtonawandacitynewyork/HSG495224#HSG495 224 (last visited April 6, 2026) (median value of owner-occupied units in North Tonawanda is $197,200).

20.     North Tonawanda has long been known for its abundance of public parks and green spaces that contribute to the community's scenic charm and provide residents with opportunities for outdoor recreation and leisure. It maintains a network of parks offering wooded trails, picnic facilities, disc golf courses, playgrounds, and waterfront access.[4] North Tonawanda also boasts an 11-acre public botanical garden, with walking paths, preserved wetlands, and boat launches providing access to the Erie Canal.[5]

21.     Alongside its natural environment, North Tonawanda holds numerous cultural and seasonal events reflecting the local identity and community engagement. For example, downtown Webster Street, the heart of North Tonawanda, hosts the long-running Winter Walk and Tree Lighting, which brings families together with performances and local shopping each holiday season.[6] In the summer, North Tonawanda's scenic Gateway Harbor hosts events like Canal Fest, a week-long celebration featuring live music, food vendors, and family-friendly activities.[7] Historic and cultural institutions like the Riviera Theatre – a hub for live concerts, classic films and other performances – enhance community life.[8]

22.     Taken together, the parks, waterway access, outdoor activities, and community events have for generations made North Tonawanda a distinctive and beloved community. Indeed,

---

[4] The Tonawandas, *North Tonawanda Parks* https://www.thetonawandas.com/parks (last visited April 6, 2026).
[5] The Tonawandas, *North Tonawanda Parks* https://www.thetonawandas.com/parks (last visited April 6, 2026).
[6] Webster Street NT, *Events* https://websterstreetnt.com/events (last visited April 6, 2026).
[7] Lumber City Life, *About North Tonawanda* https://lumbercitylife.com/2025/01/15/about-north-tonawanda/ (last visited April 6, 2026).
[8] Riviera Theatre, *Upcoming Events* https://rivieratheatre.org/ (last visited April 6, 2026).

in 2020, North Tonawanda was recognized as a "hidden gem" with high quality of life for residents.[9]

23.    Before Digi Power's arrival, residents of North Tonawanda, including Plaintiffs, enjoyed the quiet and peaceful character of their community. Neighborhoods were defined by low ambient noise levels, allowing residents to spend time outdoors and appreciate the area's natural and residential character.

## II.    Digi Power and Cryptocurrency Mining.

24.    Incorporated in 2018, Digi Power, formerly known as Digihost Technology Inc., initially positioned itself as a growth-oriented blockchain technology company. Its business model was simple: "focus on continually increasing its hashrate," or the amount of computational power it spent mining cryptocurrency, "with a concurrent reduction in energy costs."[10]

25.    Cryptocurrency is digital money that uses cryptographic technology to secure transactions and limit how much new money is created. Unlike traditional government-issued currency, cryptocurrency operates on decentralized, peer-to-peer computer networks known as "blockchains."

26.    Transactions in most cryptocurrencies are recorded on a shared public ledger called a blockchain. In order to add new transactions to the blockchain, participants must perform a process known as "mining," which involves solving complex math problems to validate

---

[9] WKBW TV Buffalo News, *Tonawanda and North Tonawanda named 'hidden gems with high quality of life'* (Feb. 12, 2020), available at https://www.youtube.com/watch?v=L1G5uAOvHxo.
[10] Globe Newswire Press Release, *Digihost Acquires 60 MW Power Plant Increasing Hashrate Capacity to 3 EH* (March 24, 2021), available at https://www.globenewswire.com/news-release/2021/03/24/2198342/0/en/Digihost-Acquires-60-MW-Power-Plant-Increasing-Hashrate-Capacity-to-3-EH.html.

transaction data. This is referred to as "proof-of-work" cryptocurrency mining. Bitcoin is the dominant proof-of-work cryptocurrency.

27.    Cryptocurrency mining is performed using specialized computer hardware that is designed to complete these math calculations quickly and efficiently. In commercial operations, miners typically use Application-Specific Integrated Circuit (ASIC) computers, which are purpose-built machines specifically designed to run the computational math for a particular cryptocurrency algorithm.

28.    The cryptocurrency mining mechanism promotes an arms race: operations with the most computational power will be rewarded with the most currency. As a result, mining operations use hundreds, if not thousands, of energy-hungry high-performance computers that are designed to run continuously – typically 24 hours per day, seven days per week – in order to maximize computational output and profitability. Any interruptions in power or equipment operation reduce the miner's revenue potential.

29.    Cryptocurrency mining's enormous energy use produces a significant byproduct: heat. ASIC mining computers generate intense heat during operation, similar to how a laptop warms up under heavy use – but on a much larger scale. Mining operators rely on extensive cooling systems, typically large industrial fans or ventilation setups, to prevent overheating, optimize performance, increase profit, and extend the life of their mining equipment.[11]

---

[11] See, e.g., Systech Design, *Cryptocurrency Mining Fans* https://www.systech-design.com/cryptocurrency-mining-fans/  (last accessed April 6, 2026) ("industrial fans ensure crypto mining facilities' efficient and long-term operation" "industrial fans will eliminate excess heat and optimize your mining operations."; Airflow Sciences Corporation, *Custom Engineering Solutions for Bitcoin Miners and Beyond* https://www.airflowsciences.com/industries/crypto-mining (last accessed April 6, 2026) ("Proper cooling is crucial to efficiently mining bitcoin. As the temperatures increase, hashrate goes down. Eventually, as the chip temperatures get hot enough, the miners will shut themselves down completely.")

7

30.    The fans and cooling equipment necessary for mining operations produce constant and often significant levels of noise and vibrations. The sound typically includes a high-pitched whine and steady mechanical hum associated with the continuous operation of hundreds or thousands of high-speed computer fans and external industrial cooling fans (also called heat rejectors) that maintain equipment temperatures.

31.    In addition to the noise that is easily perceived by the human ear, mining operations can also generate low-frequency noise which manifests similarly to physical vibrations and can be felt in the body (for example, consider how you can sometimes feel the bass of a song in your chest). In cryptocurrency mines, this low-frequency noise is caused by the mechanical resonance of high-speed fans, motors, and densely packed computer racks. These "vibrations" may be transmitted through building structures or the ground, depending on the scale and configuration of the facility, meaning it is possible to feel the noise from the facility even when you are not standing near it.

32.    Because cryptocurrency mining operations like Digi Power's run twenty-four hours per day, seven days per week, the noise and vibration conditions are continuous and unrelenting. Unlike other industrial or commercial noise sources that shut down at night, mining operations typically do not pause, leaving no reprieve for affected residents.

33.    As a result, when a cryptocurrency mining facility is sited near a community, residents suffer from constant, pervasive noise and vibrations emanating from the cryptocurrency mine's fan-cooling system – resulting not only in a severely impaired quality of life, but also in potentially serious health consequences.

34.    Industry participants – including Digi Power – have long been aware that large-scale cryptocurrency mining operations generate significant and pervasive noise. Although

industrial-scale cryptocurrency mining is a relatively recent development, reports of noise disturbances associated with such facilities emerged almost as soon as they began operating.

35.    As early as 2018, a Bitcoin mining facility in Norway faced the potential shutdown of its operations due to persistent noise complaints from neighboring residents.[12]

36.    In 2022, *The Washington Post* reported extensively on noise complaints arising from the operation of a cryptocurrency mining facility in Tennessee.[13]

37.    That same year, NASDAQ published an article authored by a pro-cryptocurrency media outlet expressly acknowledging widespread community complaints regarding noise from Bitcoin mining operations and discussing mitigation strategies.[14]

38.    Since that time, reports of noise complaints linked to cryptocurrency mining facilities have continued to increase.

39.    In light of this well-documented industry side effect, Digi Power knew or should have known that the construction and operation of a facility equipped with tens of thousands of high-powered mining computers would generate substantial off-site noise and interfere with area residents' lives.

---

[12] NASDAQ, *Noise Complaints May Cause Norwegian Bitcoin Mining Center to Shut Down* (Aug. 23, 2018), https://www.nasdaq.com/articles/noise-complaints-may-cause-norwegian-bitcoin-mining-center-to-shut-down-2018-08-23.

[13] Kevin Williams, *An Appalachian town was told a bitcoin mine would bring an economic boom. It got noise pollution and an eyesore.* WASHINGTON POST (March 18, 2022), https://www.washingtonpost.com/business/2022/03/18/bitcoin-mining-noise-pollution-appalachia/.

[14] Jack Voell, *We Hear You: Bitcoin Mining Noise Pollution Is A Solved Problem*, NASDAQ (June 2, 2022), https://www.nasdaq.com/articles/we-hear-you%3A-bitcoin-mining-noise-pollution-is-a-solved-problem.

40.     Instead, Digi Power represented that no noise would escape its facility – a representation that was inconsistent with widely known industry experience and was false or misleading at the time it was made.

### III.   Digi Power Expands to North Tonawanda.

41.     In March 2021, Digi Power announced its agreement to acquire a power plant in upstate New York, which would allow it to operate an additional 18,000 Bitcoin mining computers, potentially increasing the company's hashrate (i.e., the computational power devoted to Bitcoin mining) from 190 petahash (PH) to 3 exahash (EH)[15] – an increase of approximately 1,479%. The power plant was later revealed to be the Fortistar North Tonawanda plant located at 1070 Erie Avenue.

42.     The Fortistar North Tonawanda plant occupies a 13.7-acre parcel zoned for Light Manufacturing use and sits directly adjacent to residential neighborhoods.[16]

43.     Digi Power's 24-hour data center operation and cryptocurrency mining is not a permitted use under applicable North Tonawanda zoning laws. *See* North Tonawanda Code § 103-12(A) (setting forth 20 categories of permitted uses in light manufacturing districts) (the "Zoning Ordinance").

44.     The Zoning Ordinance expressly contemplates that any permitted uses capable of emitting noise or vibrations must adopt mitigation measures aimed at safeguarding the surrounding community.[17] Moreover, the Zoning Ordinance expressly prohibits "[a]ny use of land, building or

---

[15] Petahash (PH) and exahash (EH) are units of computing power used in cryptocurrency mining that measure the number of calculations performed per second, with one petahash equal to $10^{15}$ calculations per second and one exahash equal to $10^{18}$ calculations per second.

[16] Zoning District Map – City of North Tonawanda, https://www.niagaracountybusiness.com/file-library/100210/city_nton_zoning_map.pdf.

[17] *See, e.g.*, § 103-12(A)(4) (permitting the manufacture and or assembly of electronic devices, electrical appliances and the application or manufacture of atomic devices, **provided all**

structure that may be hazardous, noxious or injurious by reason of the production or emission of dust, smoke, refuse matter, odors, gas, fumes, noise, vibration or similar circumstances or conditions." North Tonawanda Code § 103-12(E).

45.    Before its acquisition by Digi Power, the Fortistar plant operated only intermittently – between approximately 10 and 25 days per year from 2017 through 2021.  During this time, the property was not a source of noise complaints.

46.    Digi Power's plans for the site involved building a large-scale cryptocurrency mining operation, which would be powered by the gas plant.

47.    Phase I called for the installation of sixteen 40-foot shipping containers filled with computer servers, stacked two containers high; Phase II proposed an additional twelve containers. Each container would house several hundred high-powered computers requiring constant ventilation by large industrial fans. These containers were to be placed on newly constructed concrete pads in the grassy area adjacent to the power plant.

48.    On March 29, 2021, Digi Power announced the acquisition of 700 more mining computers for delivery in April. CEO Michel Amar characterized the deployment as the first of "many new acquisitions going forward" and highlighted Digi Power's plan to utilize the 3EH

---

**necessary and approved safeguards are employed to prevent hazard or annoyance to the community**); **§** 103-12(A)(5), (E) (permitting "the manufacture, compounding, processing and storage of candy and confections, frozen foods, cosmetics, pharmaceutical products, toiletries and food products" but *expressly prohibiting "[a]ny use of land, building or structure that may be hazardous, noxious or injurious by reason of the production or emission of. . . gas, fumes, noise, vibration or similar circumstances* or conditions."); **§** 103-12(A)(7) (permitting "[t]ool-, die-, and pattern-making and machine shops, *provided that any obnoxious or annoying noises and/or vibrations are confined within the premises*.")

hashing capacity from the recently announced 60 MW power plant acquisition to reduce energy costs by up to 40%.[18]

49.     On May 12, 2021, Digi Power announced an agreement to acquire approximately 10,000 more mining computers for delivery between August and December. CEO Michel Amar described the agreement as a means of accelerating Digi Power's computational power to more than 1.145EH by the end of the year, which could result in approximately $80 million in operating profit in 2022.[19]

50.     On June 17, 2021, Fortistar filed a petition with the New York Public Service Commission (PSC) seeking approval to transfer ownership of the Fortistar North Tonawanda facility to Digi Power.

51.     On June 30, 2021, Digi Power submitted an application for site plan review to the City of North Tonawanda for the proposed bitcoin mining operation. Additional applications were filed with the PSC and the New York State Department of Environmental Conservation (DEC) on July 12, 2021.

52.     In its Environmental Assessment Form submitted to the City of North Tonawanda, Digi Power represented that there were only industrial land uses surrounding the project site, even

---

[18] March 29, 2021 Globe Newswire, *Digihost Acquires 700 S17+ 76TH Bitcoin Miners for Immediate Delivery*, https://financialpost.com/globe-newswire/digihost-acquires-700-s17-76th-bitcoin-miners-for-immediate-delivery.
[19] May 12, 2021 Globe Newswire, *Digihost Announces Deal With Northern Data AG Acquiring 10,000 Bitcoin Miners and Increasing Hashrate By 925PH*, https://www.sec.gov/Archives/edgar/data/1854368/000121390021033364/ea140792ex99-116_digihost.htm).

though there were residential homes less than 500 feet away from the proposed site project, and multiple school buildings just one mile away.[20]

53.    Residents of North Tonawanda first learned of Digi Power's plans in August 2021, when news of the proposed cryptocurrency operation first became public.[21]

54.    Throughout August 2021, the North Tonawanda Planning Board received dozens of written objections from community members raising specific concerns about the unique environmental and health impacts associated with cryptocurrency mining—most prominently, the potential for excessive and continuous industrial noise.

55.    In its environmental assessment filings, Digi Power represented that its operations would not produce noise exceeding existing ambient levels, even though it intended to operate continuously – 24 hours per day, 7 days per week, including weekends and holidays.

56.    On August 17, 2021, Digi Power gave a presentation at the North Tonawanda Common Council meeting, which many community members attended including Plaintiff Polito and Plaintiff Demers. Throughout Digi Power's presentation, Digi Power CEO, Michel Amar, emphasized its objectives and priorities around being a friendly operation in North Tonawanda, stating "We have servers, they are isolated in a brand new beautiful containers and soundproof. You won't hear anything on the street outside the fence of the property."[22]

---

[20] August 12, 2021 Public Notice, https://www.northtonawanda.gov/documents/legal%20notice/fortistar%20amended%20seqr_2.pdf, Page 9 of 13.
[21] *Id.* https://www.northtonawanda.gov/documents/legal%20notice/fortistar%20amended%20seqr_2.pdf.
[22] readMedia, ICYMI: North Tonawanda Residents Harmed By Constant Noise Pollution (June 17, 2024), http://readme.readmedia.com/ICYMI-North-Tonawanda-Residents-Harmed-By-Constant-Noise-Pollution/20218995.

57.     Digi Power's presentation to the Council and community members also prominently featured the promise: "No noise will be heard anywhere outside the premises."[23]

58.     As public concern about the Mining Facility's impact intensified, Digi Power representatives publicly assured residents, through statements to local media, that "we want to be good neighbors."[24]

59.     Despite these assurances, upon information and belief, Digi Power made no attempts to study or assess the potential noise and vibration impact on the community surrounding its mining facility, nor did it evaluate any reasonable noise-prevention or mitigation measures.

60.     On September 8, 2021, the North Tonawanda Planning Board approved the project.[25]

## IV.     The Digi Power "Noise Nightmare."

61.     On September 15, 2022, the sale of the Fortistar plant was ultimately approved, notwithstanding repeated public objections, letters, and community rallies urging officials to halt the project until a full environmental review could be conducted.

62.     With this approval, Digi Power was able to ramp up its operations to 24/7/365, increasing its greenhouse gas emissions up to 3,500 percent.[26]

---

[23] readMedia, ICYMI: North Tonawanda Residents Harmed By Constant Noise Pollution (June 17, 2024), http://readme.readmedia.com/ICYMI-North-Tonawanda-Residents-Harmed-By-Constant-Noise-Pollution/20218995.

[24] WKBW, *North Tonawanda council votes down blockchain mining moratorium* (Aug. 18, 2021), https://www.wkbw.com/news/local-news/north-tonawanda-council-votes-down-blockchain-mining-moratorium?utm.

[25] City Planning Commission, *Meeting Minutes* (Sept. 8, 2021) https://www.northtonawanda.org/file-library/100179/PlanningBoard090821.pdf.

[26] EarthJustice, *New York Court Rescinds Approval of Fracked Gas Power Plant Sale to Cryptocurrency Mining Company in North Tonawanda* (Nov. 14, 2024) https://earthjustice.org/press/2024/victory-new-york-court-rescinds-approval-of-fracked-gas-power-plant-sale-to-cryptocurrency-mining-company-in-north-tonawanda.

63.    Immediately, residents began to experience powerful, unrelenting noise and low-frequency vibrations emanating from the facility.

64.    The deep mechanical hum penetrated walls, windows, and doors, creating a constant disturbance that interfered with sleep, family life, and the general quiet enjoyment of homes across nearby neighborhoods. Pets exhibited signs of distress, and residents reported persistent anxiety and fatigue resulting from the continuous noise exposure.

65.    Residents raised these concerns during meetings of the North Tonawanda Common Council.[27] However, the pervasive noise persisted.

66.    On November 1, 2021, residents filed a motion for preliminary injunction against the City of North Tonawanda and its Planning Board, challenging the approval process for the Digi Power facility.

67.    The petition alleged violations of multiple state and local laws, including North Tonawanda's Zoning Ordinance, the State Environmental Quality Review Act (ECL § 8-0101 et seq.), and General Municipal Law § 239-M. The petition also raised concerns about the increase in noise pollution from the proposed facility, which residents feared would impact their quality of life.[28]

68.    During a March 17, 2022, court hearing on the residents' injunction motion, the Honorable Frank A. Sedita III specifically admonished Digi Power's representatives, stating: "I think it would be a very good idea to reduce the noise that your facility's generating. I think that would be a smart thing to do for a lot of reasons. It would also be the decent thing to do. It would

---

[27] North Tonawanda Common Council, *Meeting Minutes* (Mar. 1, 2022) northtonawanda.org/file-library/100209/CommonCouncilMinutes030122.pdf.
[28] See *Sierra Club v. City of North Tonawanda*, Index No. E176242/2021, at ¶¶ 3–5 (Nov. 1, 2021), https://cdn.climatepolicyradar.org/navigator/USA/2021/sierra-club-v-city-of-north-tonawanda_9a1b73bc3fa0433dc94fbccc72724482.pdf.

also be the right thing to do, especially if you wish to open additional facilities in this area or this region."

69.     Despite this judicial warning, Digi Power did not meaningfully reduce noise levels, and residents continued to repeatedly raise concerns over the never-ending noise at Common Council meetings.[29]

70.     During this time, Digi Power was in conversation with the North Tonawanda Zoning Board to discuss installing a 26-foot acoustic wall around its property that would purportedly reduce the noise emanating from the facility.

71.     Residents raised concerns that the wall would be ineffective or would merely direct the noise to different surrounding neighborhoods. Despite these concerns, Digi Power chose to proceed with plans to install the wall, rather than exploring other options (such as enclosing the shipping containers with the mining computers in a building) because it was less expensive.

72.     Over time, the noise worsened in both intensity and character.

73.     By 2023, residents reported that the constant drone had evolved into a deeper, more pulsating vibration that shook walls and rattled windows, particularly at night. Community members continued to voice their concerns at Common Council meetings, questioning whether anything could be done to control the noise from Defendant's Mining Facility.[30]

---

[29] North Tonawanda Common Council, *Meeting Minutes* (Aug. 2, 2022) https://www.northtonawanda.org/file-library/100216/CommonCouncilMinutes08022022.pdf (Jack Kanack testified "there is a noise coming from across the canal from Washington Mills and it goes on all day and night.").

[30] North Tonawanda Common Council, *Meeting Minutes* (Oct. 17, 2023) https://www.northtonawanda.org/file-library/100326/CommonCouncilMinutes101723.pdf (Joyce Schultz, "Wanted to know if something can be done to control the noise coming from the Bitcoin Plant to resolve this for the residents.").

74.     Despite the complaints from residents, Digi Power acquired another 1,700 mining computers in 2023.[31]

75.     Although it was widely believed that Digi Power was violating the City's noise ordinance, at the time, the City did not own equipment capable of measuring the noise to assess compliance with the noise ordinance. Prior to Digi Power's operations, the City had never needed such equipment: no other facility had created such a persistent and pervasive threat to public peace.

76.     In or around 2023, Defendant installed the 26-foot acoustic wall, which residents describe as "more like a privacy fence", intended to deafen the noise stemming from its mining operation.[32]

77.     While the acoustic wall altered the character of the sound, as residents had feared, it neither diminished its magnitude nor abated the nuisance. Indeed, some residents find the sound to be more offensive since the barrier's installation.[33]

78.     Undeterred by the mounting noise complaints from the North Tonawanda community, Digi Power continued to expand its operations.

79.     On March 5, 2024, Digi Power announced a hosting agreement for 4,640 more mining computers. In his statement regarding the transaction, CEO Michel Amar characterized it

---

[31] May 16, 2023 Press Release, *Digihost Reports Positive Adjusted EBITDA for Q1 2023 and Provides Operational Update*, https://www.sec.gov/Archives/edgar/data/1854368/000117184323003336/exh_991.htm.

[32] John Szalasny, *Voices from North Tonawanda residents cannot drown out constant noise from Crypto Miner*, BUFFALO RISING (June 24, 2024), https://www.buffalorising.com/2024/06/voices-from-north-tonawanda-residents-cannot-drown-out-constant-noise-from-crypto-miner/.

[33] John Szalasny, *Voices from North Tonawanda residents cannot drown out constant noise from Crypto Miner*, BUFFALO RISING (June 24, 2024), https://www.buffalorising.com/2024/06/voices-from-north-tonawanda-residents-cannot-drown-out-constant-noise-from-crypto-miner/.

as a financial triumph, focusing solely on the deal's ability to strengthen Digi Power's "financial and overall cash flow position" and convert its mining fleet with "minimal stock dilution."[34]

80.      On May 14, 2024, the facility's non-stop noise was again the focus of a Common Council meeting. Alderman at Large Joseph Lavey described his experience, which echoes the concerns of residents across the city: "I live almost two miles away and it sounds like it's in my backyard…When I go outside to get a cup of coffee to get some peace and quiet? You don't get that anymore."[35]

81.      At that same meeting, Council President Frank DiBernardo noted that "They (Digi Power) haven't even come close to meeting the promises they made three years ago," and emphasized the importance of finding a way to quiet the incessant noise.[36]

82.      Three months after it announced the addition of 4,640 mining computers – and in spite of the persistent noise complaints from North Tonawanda residents – Digi Power stated that it was again "thrilled" to announce the integration of more computers. On June 11, 2024, Digi Power announced a hosting and profit-sharing agreement to integrate 11,000 mining computers, with the hopes of increasing its hashrate to a staggering 5 EH by the end of 2024.[37]

83.      In July 2024, North Tonawanda Mayor Austin Tylec wrote a proposal to the Common Council to hire the Noise Pollution Clearinghouse to conduct a noise study. Mayor Tylec

---

[34] Global Newswire Press Release, *Digihost Expands Bitcoin Mining Fleet With Addition of 4,640 S19 XPs 150TH Under Multi-Year Hosting Deal* (March 5, 2024), https://www.globenewswire.com/news-release/2024/03/05/2840220/0/en/digihost-expands-bitcoin-mining-fleet-with-addition-of-4-640-s19-xps-150th-under-multi-year-hosting-deal.html.

[35] readMedia, ICYMI: North Tonawanda Residents Harmed By Constant Noise Pollution (June 17, 2024), http://readme.readmedia.com/ICYMI-North-Tonawanda-Residents-Harmed-By-Constant-Noise-Pollution/20218995.

[36] *Id.*

[37] Press Release, Digihost Expands Bitcoin Mining Operations with 11,000 S21s Increasing Hashing Rate to 3.2 EH/s (June 11, 2024), https://www.digipowerx.com/press-releases/ai4grnj9l4myraok0bj0sbq3.

informed reporters that he "spoke with Digihost and they were kind enough to say that they will reimburse the city up to $30,000. So it won't cost taxpayers to provide this service."[38]

84.    In response to the constant noise complaints, the City also purchased specialized noise monitoring equipment and City police officers were trained by experts from the Noise Pollution Clearinghouse on taking decibel readings, using the monitors. Measurements taken thereafter confirmed that Defendant's Mining Facility repeatedly exceeds permissible decibel levels under the City's ordinance.

85.    North Tonawanda police chief Keith Glass confirmed these violations, stating "I specifically looked at the sound after 10 p.m., and it was an easy violation every single night."[39]

86.    The City has since issued multiple citations to Defendant for violating the Noise Ordinance. The North Tonawanda City Court denied Defendant's motion to dismiss these citations, and the case remains pending.[40]

87.    At the time of the violations, the noise ordinance imposed a $250 monetary penalty for violations.[41] City officials have expressed concern that this penalty is insufficient to deter future

---

[38] WKBW, *North Tonawanda neighbors voice concerns over noise and emissions from Digihost Plant* (July 1, 2024), https://www.wkbw.com/news/local-news/concerns-are-increased-emissions-north-tonawanda-neighbors-worry-over-digihost-plant?utm.

[39] Joseph Clark, *Residents outraged as crypto mining facility terrorizes them around clock: 'Just terrible'*, THE COOLDOWN (September 2, 2025), https://www.thecooldown.com/green-business/crypto-mining-noise-pollution-digipower-x/.

[40] Dillon Morello, *Digihost plant manager appears in court over noise violations in North Tonawanda*, WIVB (Sep. 9, 2025), https://www.wivb.com/news/digihost-plant-manager-appears-in-court-over-noise-violations-in-north-tonawanda/.

[41] The Common Council of the City of North Tonawanda adopted an amended noise ordinance on February 17, 2026, which slightly increases the monetary penalty for violations.

violations, explaining that this fine "just doesn't play out 30 years later since this law was created."[42]

88.     In July 2024, the North Tonawanda Common Council voted unanimously to place a moratorium on new crypto-mining operations in the city.[43]

89.     The moratorium put a two-year pause on construction of any new crypto mining plants, as well as the expansion of existing facilities like Digi Power. However, the moratorium does not address the ongoing noise pollution stemming from Digi Power's existing operations.

90.     The noise and vibrations from Defendant's operations have persisted and evolved over time, constituting a continuing nuisance that causes ongoing and fresh injury to residents each day the Mining Facility operates. The nuisance is not static: changes to Digi Power's equipment, load levels, and operating configurations have repeatedly altered the character, intensity, and duration of the noise.

91.     Moreover, Digi Power is poised to expand its operations in North Tonawanda – likely in violation of the City's moratorium.

92.     In December 2025, residents learned that Digi Power had connected to the local electricity grid, despite having represented on a State Environmental Quality Review Act (SEQR)

---

[42] Dillon Morello, *Digihost plant manager appears in court over noise violations in North Tonawanda*, WIVB (Sep. 9, 2025), https://www.wivb.com/news/digihost-plant-manager-appears-in-court-over-noise-violations-in-north-tonawanda/.

[43] City of North Tonawanda, *Local Law #2: Resolution to Adopt a Two-Year Moratorium on Cryptocurrency Mining and Data Processing Centers*, https://www.northtonawanda.gov/documents/Common%20Council/Moritorium-2.pdf (last accessed April 6, 2026).

20

form submitted to regulators that it would use only "on site power generation" and require only "up to 55 megawatts" of power.[44] No updated SEQR form has been submitted.

93.    That same month, Digi Power announced to shareholders that it had "expanded and de-risked its power footprint" by securing 123 MW of additional power in North Tonawanda.[45]

94.    These ongoing noise emissions continue to interfere with residents' daily lives, diminish property values, and erode the quiet enjoyment that once characterized the North Tonawanda community. They also increase residents' risk of developing serious health conditions.

95.    Community members have expressed their distress about the inescapable noise nightmare. As one resident told reporters: "You don't get used to it. No, it doesn't drown out. It's always there. It's like a gnat, picking at you. . . this is 24/7. People who don't hear it just don't understand what we're going through."[46]

96.    Another resident emphasized how the mining operation impairs sleep and makes it impossible to relax within his home: "Upstairs, in my plant-facing bedroom windows, the window-penetrating noise is just terrible. You can't sleep. On my backyard deck, noise bouncing off the homes behind me is also irritating, taking away the peacefulness of my own home."[47]

---

[44] *See* August 12, 2021 Public Notice, https://www.northtonawanda.gov/documents/legal%20notice/fortistar%20amended%20seqr_2.pdf Page 7.

[45] Form 51-102F3 Material Change Report, https://www.sec.gov/Archives/edgar/data/1854368/000121390025125569/ea027092901ex99-1_digi.htm (last accessed April 6, 2026).

[46] *Noise problems continue to for neighbors of the Digihost plant in North Tonawanda*, WGRZ-TV (June 24, 2024), https://www.youtube.com/watch?v=cOr3yGZB_gQ.

[47] Joseph Genco, *North Tonawanda Noise Nightmare*, NIAGARA EXPRESS (Aug, 14, 2025), https://niagaraexpress.town.news/g/niagara-falls-ny/n/330530/north-tonawanda-noise-nightmare.

## V.    Persistent Noise is a Known Health Harm.

97.    Sound affects the body. This fact is widely understood and employed in various fields: from the soothing tones played at a spa to encourage relaxation, to the low-frequency infrasound woven into the soundtrack of horror movies to instill fear, tension and stress in the audience.

98.    Noise is defined as any sound that is unwanted.[48] This can mean, among other things, sound that is too loud, sound that lasts too long, or sound that is disturbing.

99.    There are three basic dimensions of sound, each of which can contribute to the perception of noise: magnitude (i.e., volume), frequency (i.e., pitch), and time (i.e., duration and variation).[49]

100.    Thus, a sound may not be disturbing if heard only for a short time, but when experienced constantly, it can become a significantly disturbing noise. The same is true of the circumstance in which sound is heard. For example, while high volume music with resonant bass may be an enjoyable sound for an hour at a concert, it is a disturbing noise when you are trying to sleep.

101.    Noise disturbance can also be amplified depending on the volume and pitch of the sound. For example, noise with tonal components – whistles, whines, or hums – is often perceived as more annoying than broadband noise because the human ear is more sensitive to pure tones.[50]

---

[48] Institute of Noise Control Engineering, *What is Noise?* https://www.inceusa.org/about-ince-usa/what-is-noise/ (last visited April 6, 2026).

[49] Institute of Noise Control Engineering, *What is Noise?* https://www.inceusa.org/about-ince-usa/what-is-noise/ (last visited April 6, 2026).

[50] Sustainability Directory, *What Is Tonal Noise and Why Is It Considered More Annoying than Broadband Noise?*
(Nov. 26, 2025), https://pollution.sustainability-directory.com/learn/what-is-tonal-noise-and-why-is-it-considered-more-annoying-than-broadband-noise/.

102.     In general, sound becomes a disturbance when it exceeds 50 dB(A) during the daytime.[51] At 70 dB(A), the noise can be disruptive to a phone call.



Credit: Institute of Noise Control Engineering

103.     Persistent exposure to elevated noise levels – even when those levels are not extremely high in A-weighted decibel dB(A) terms – has been demonstrated in the peer-reviewed literature to cause a variety of auditory and non-auditory health harms.

---

[51] Institute of Noise Control Engineering, *What is Noise?* https://www.inceusa.org/about-ince-usa/what-is-noise/ (last visited April 6, 2026).

104.    Long-term or repeated exposure to sounds above 85 dBA can cause tinnitus, hearing impairment, or hearing loss. The louder the sound, the less time it takes to damage hearing.[52]

105.    Exposure to persistent lower-level noise, particularly with low-frequency or tonal components, can lead to increased annoyance, stress, reduced sleep quality, and secondary psychological harms such as anxiety or depression.[53]

106.    Peer-reviewed literature also shows that persistent noise exposure contributes to non-auditory health harms including stress hormone dysregulation, impaired cognitive performance, and cardiovascular disease.[54]

107.    Chronic noise exposure activates the body's stress response (including the hypothalamic-pituitary-adrenal axis and the sympathetic nervous system), leading to elevated stress hormones, oxidative stress, endothelial dysfunction, elevated blood pressure and other cardiovascular effects—even in individuals who do not subjectively perceive the noise as "loud."[55]

---

[52] Noise Induced Hearing Loss, National Institute on Deafness and Other Communication Disorders, https://www.nidcd.nih.gov/health/noise-induced-hearing-loss (last visited Mar. 16, 2025); Wang et al., *Noise Induced Hearing Loss and Tinnitus—New Research Developments and Remaining Gaps in Disease Assessment, Treatment, and Prevention*, Brain Sciences 2020 Oct 13;10(10):732. doi: 10.3390/brainsci10100732, http://pmc.ncbi.nlm.nih.gov/articles/PMC7602100/.

[53] *See, e.g.*, Hahad et al., *Environmental Noise-Induced Effects on Stress Hormones, Oxidative Stress, and Vascular Dysfunction: Key Factors in the Relationship between Cerebrocardiovascular and Psychological Disorders* (November 11, 2019), https://pmc.ncbi.nlm.nih.gov/articles/PMC6878772/.

[54] *See, e.g.*, UC David Center for Occupational and Environmental Health, *How noise pollution quietly affects your* health (June 2, 2025), https://coeh.ucdavis.edu/research/how-noise-pollution-quietly-affects-your-health; Harvard Magazine, *Noise and Health*: *Noise pollution is more than a nuisance. It's a Health Risk* (2022), https://magazine.hms.harvard.edu/articles/noise-and-health.

[55] Arregi et al, *Road traffic noise exposure and its impact on health: evidence from animal and human studies—chronic stress, inflammation, and oxidative stress as key components of the complex downstream pathway underlying noise-induced non-auditory health effects*, ENVIRON. SCI. POLLUT. RES. INT. (July 8, 2024), https://pmc.ncbi.nlm.nih.gov/articles/PMC11297122/.

108. Epidemiological studies show that environmental noise exposure is associated with elevated risks of hypertension, ischemic heart disease, atrial fibrillation, and stroke.[56]

109. Moreover, what noise is reasonable and/or safe during the day is different from what is reasonable at night.

110. The World Health Organization (WHO) recommends that average night noise exposure should not exceed 40 decibels (dB) to prevent adverse health effects from sleep disturbance.[57]

111. Exposure to higher levels of nighttime noise, "even 50 dB, can cause moderate health effects over time. Prolonged exposure above 55 dB can lead to cardiovascular issues."[58]

112. Persistent anthropogenic noise also interferes with wildlife behavior, breeding, foraging, predator-prey dynamics, communication among animals (especially species that rely on acoustic signaling), habitat use and movement.[59]

## PLAINTIFFS' EXPERIENCES

### PLAINTIFF SHARON DEMERS

113. Plaintiff Sharon Demers is a lifelong resident of North Tonawanda. Plaintiff Demers and her husband purchased their home at 1070 Remington Drive, North Tonawanda, NY in or around December of 1986 and have resided there ever since. Mrs. Demers' home is located approximately one-third of a mile from the Digi Power facility.

---

[56] Tabei et al., *The relationship between noise pollution and cardiovascular diseases: an umbrella review on meta-analyses*, BMC Cardiovascular Disorders (Aug. 26, 2025), https://link.springer.com/article/10.1186/s12872-025-04864-9?utm.

[57] Sustainability Directory, *What is the Recommended Decibel Level for Residential Areas at Night?* (Nov. 24, 2025), https://pollution.sustainability-directory.com/learn/what-is-the-recommended-decibel-level-for-residential-areas-at-night/.

[58] Id.

[59] Sarah Whitmore, *The Surprising Impact of Nosie Pollution on Wildlife* (May 18, 2025), https://thenaturenetwork.co.uk/the-surprising-impact-of-noise-pollution-on-wildlife/.

114.    Prior to Digi Power's operation, Mrs. Demers enjoyed the peace and quiet that was characteristic of her neighborhood. Mrs. Demers regularly spent time outdoors: she enjoyed taking walks around her neighborhood, drinking coffee on her porch, relaxing on her back deck, gardening, and hosting gatherings of friends and family in her backyard. She relished the simple pleasure of keeping her windows and doors open during warmer months to feel a breeze, breathe fresh air, cool her home, and enjoy the sounds of nature and the children who frequented the playground down the block. Mrs. Demers was able to relax indoors, sleep through the night, and generally enjoy the peace and tranquility of her home and its surrounding area.

115.    That all changed in approximately 2022, when Digi Power escalated its operations at 1070 Erie Avenue. Mrs. Demers began to hear a loud, persistent hum emanating from the facility. The noise has worsened in both volume and character as the facility has increased its operations.

116.    Mrs. Demers is bombarded by this noise twenty-four hours per day, seven days per week, with no reprieve. Some days the noise is louder than others, based on wind and other weather conditions. But while the noise varies in intensity, it remains inescapable in its presence.

117.    The nonstop, aggravating noise unreasonably interferes with Mrs. Demers's ability to use and enjoy her home. She can no longer spend time outside as she once enjoyed before Digi Power's operation; she can no longer relax in her backyard or use her porch or host outdoor gatherings at her home. She can no longer have her windows or doors open. Sometimes, she cannot even hold a conversation outside of her house due to the extreme noise.

118.    Mrs. Demers cannot escape the noise by retreating indoors. Even with the windows and doors closed, she is constantly exposed to the noise, which disrupts her ability to relax or find tranquility within her home. In addition to the daytime disturbances, she can no longer sleep through the night due to the noise. She has tried sleeping with earplugs, a sound machine, a fan,

and with television on in the background – all to no avail. In addition to always hearing the mechanical whir, she can feel the sound vibrations caused by the facility's operations throughout her home.

119.    Mrs. Demers has experienced, and continues to experience, numerous health effects because of the noise, including, but not limited to, fatigue, anxiety, increased stress, insomnia and difficulty sleeping, mental anguish, and exacerbation of underlying health conditions. She is further concerned that chronic exposure to this noise will increase her risk of future negative health effects.

120.    Mrs. Demers has incurred out-of-pocket losses due to Digi Power's operations. Because she cannot open her windows and doors due to the noise, she must run the air conditioner more frequently, resulting in greater costs. Further, she has reason to believe that Digi Power's electricity intensive operations have caused her and other residents' utility bills to increase.

121.    Mrs. Demers also has reason to believe that that the value of her home has significantly decreased due to the presence of the Digi Power facility and the inescapable noise that penetrates the windows and walls of her home. She likewise has reason to believe that her home value has decreased due to the stigma of living near such a facility.

### PLAINTIFF KAREN HANCE

122.    Plaintiff Karen Hance has resided at 1191 Sherwood Avenue in North Tonawanda, New York since June 2009. Ms. Hance owns her home and resides there with her son. Plaintiff Hance's home is less than 1,000 feet from the Digi Power Facility.

123.    When looking for a home to buy, Ms. Hance prioritized purchasing a house in a quiet area with a nice backyard where she could garden and spend time in nature. These characteristics were material in her decision to purchase her property at 1191 Sherwood Avenue.

124. Prior to Digi Power's operation, Ms. Hance enjoyed the peace and quiet that was characteristic of her neighborhood. Ms. Hance regularly spent time outdoors: she enjoyed taking walks around the neighborhood; cultivating the robust gardens in her backyard; eating meals outside on her back deck; and hosting gatherings of friends and family in her outdoor space. She cherished the aesthetic value of observing the wildlife that frequented her yard, including birds, butterflies, bees, and possums. She savored the simple pleasure of opening her windows during warmer months to feel a breeze, breathe fresh air, cool her home, and enjoy the sounds of nature. Plaintiff Hance was able to relax inside, sleep through the night, and generally enjoy the tranquility of her home and the surrounding area.

125. That all changed in approximately 2022, when Digi Power escalated its operations at 1070 Erie Avenue. Ms. Hance began to hear a loud, persistent hum emanating from the facility. The noise has worsened in both volume and character as the facility has increased its operations.

126. Ms. Hance is bombarded by this noise twenty-four hours per day, seven days per week, with no reprieve. Some days the noise is louder than others, based on wind and other weather conditions. But while the noise varies in intensity, it remains inescapable in its presence.

127. The nonstop, aggravating noise unreasonably interferes with Ms. Hance's ability to use and enjoy her home. Ms. Hance can no longer spend time outside as she did before Digi Power's operation; she no longer eats meals on her back deck; no longer enjoys tending to her garden; and no longer entertains guests in her outdoor space, fearing the constant noise will cause them irritation or disrupt their ability to hold a conversation. She no longer keeps her windows open. She sees far less wildlife in her yard and has reason to believe that the animals have fled due to the noise.

128. Plaintiff Hance cannot escape the noise by retreating indoors. Even with the windows closed, she is constantly exposed to the noise, which disrupts her ability to relax or find tranquility within her home. At times, the noise is so loud that Ms. Hance cannot even hear the television playing in her living room or bedroom, even with the volume turned up. In addition to the daytime disturbances, she has difficulty falling asleep and can no longer sleep through the night due to the noise. Ms. Hance has tried playing the television to drown out the sound, but at most, her sleep remains fragmented. In addition to always hearing the mechanical whir, she can feel the sound vibrations caused by the facility's operations throughout her home.

129. Ms. Hance has also experienced, and continues to experience, numerous health effects because of the noise including, but not limited to, headache and exacerbated migraines, fatigue, anxiety, increased stress, insomnia and difficulty sleeping, and mental anguish. She has sought treatment for these conditions. She is further concerned that chronic exposure to this noise will increase her risk of future negative health effects.

130. Ms. Hance has incurred out-of-pocket losses due to Digi Power's operations. Because she cannot open her windows due to the noise, she must run the air conditioner more frequently, resulting in greater costs. Moreover, prior to Digi Power's operations, Ms. Hance specifically avoided running her air conditioning unit due to the noise it created; but the noise from her air conditioner is the lesser of two evils as compared to the noise from Digi Power that invades her home through open windows. Plaintiff Hance also has reason to believe that Digi Power's electricity intensive operations have caused her and other residents' utility bills to increase.

131. In addition to harms related to the persistent noise, Ms. Hance is concerned about the potential health risks associated with the increase in local air pollution due to the facility's 24/7 operation, including but not limited to the discharge of PM2.5 emissions. Ms. Hance had an air

quality monitor installed near her home in or around 2024 and observed that it would regularly report potentially dangerous air quality.

132.    Ms. Hance also has reason to believe that that the value of her home has significantly decreased due to the presence of the Digi Power facility and the inescapable noise that penetrates the windows and walls of her home. She likewise has reason to believe that her home value has decreased due to the stigma of living near such a facility.

### PLAINTIFF MARK POLITO

133.    Plaintiff Mark Polito has resided at 637 Fairmont Avenue in North Tonawanda, New York since approximately April 2018. Mr. Polito owns his home, which is located just under 1/2 mile from the Digi Power Facility.

134.    Prior to the construction of the Digi Power Facility, Mr. Polito enjoyed the peace and quiet that was characteristic of his neighborhood. Mr. Polito regularly spent time outdoors: he enjoyed taking walks around his neighborhood; relaxing in his backyard and sunbathing, reading, or sitting by a bonfire; grilling on his back patio and eating his dinner outside; and hosting gatherings of friends and family in his backyard. From his yard, he was regularly immersed in the sights and sounds of nature, from singing birds to the scuffle of rabbits and squirrels. When the weather was nice, he enjoyed opening his home's windows to feel the breeze and breathe the fresh air.

135.    During the process of buying his home, one of the selling points was the superior insulation quality of 637 Fairmont Avenue. The home builder – who originally built this home for his own family – emphasized that within the walls of this house, he would be able to relax in total quiet; this feature was important to Mr. Polito in deciding to buy the house. And indeed, for the first several years of living at 637 Fairmont Avenue, Mr. Polito relished the peace and quiet

that his home provided. He was able to relax inside, sleep through the night, and generally enjoy the tranquility of his home and the surrounding area.

136. That all changed in 2022, when Digi Power escalated its operations at 1070 Erie Avenue. Mr. Polito began to hear a loud, persistent hum emanating from the facility. He describes the noise from Digi Power as being like a "jet engine that never turns off." The noise has worsened in both volume and character as the facility has increased its operations.

137. Mr. Polito lives with this noise twenty-four hours per day, seven days per week, with no reprieve. Some days the noise is louder than others, based on wind and other weather conditions. But while the noise varies in intensity, it remains constant in its presence.

138. The nonstop, aggravating and unbearable noise unreasonably interferes with Mr. Polito's ability to use and enjoy his home. He can no longer relax in his backyard or on his back patio; no longer uses his fire pit; no longer sits outside to enjoy the sunshine or read a book; and no longer eats meals outdoors with his family when the weather is nice. While Mr. Polito used to enjoy having friends and family over to spend time in his yard, he does so with far less frequency due to the noise of the Digi Power Facility; indeed, it is only when he has large gatherings with loud music that the noise is somewhat drowned out, although the noise persists.

139. Although his home was built with excellent insultation, the sound and vibrations from the Digi Power facility still penetrate Mr. Polito's home. While he once enjoyed the meditative silence, he is now forced to play the TV or turn up his music more frequently to drown out the sound of the facility. Even this does not mask the sound completely.

140. In Mr. Polito's words: "I feel like a prisoner in my own home. My family's home has been invaded and we are under attack."

31

141. Mr. Polito has also experienced, and continues to experience, numerous health effects because of the noise including, but not limited to, anxiety, chronic increased stress, mental anguish, sleep fragmentation, and exacerbation of cardiovascular problems. He is further concerned that chronic exposure to this noise will increase his risk of future negative health effects.

142. Mr. Polito is also concerned about the comfort and wellbeing of his children and grandchildren when they visit his home. The guest bedroom where his children stay faces the Digi Power facility. Mr. Polito has observed that the disturbing noise can easily be heard from the bedroom; and when his children have stayed over, they have commented on the noise. He is also worried that his young grandchildren will be unable to sleep through the night due to the constant whining of the fans that penetrate the walls of his house.

143. Additionally, Mr. Polito has observed that his dog, Ruggy, began exhibiting signs of distress since the noise began emanating from Digi Power's facility. Ruggy once enjoyed lounging in the sun, playing outside and exploring the background. Since Digi Power's operations began, Mr. Polito has observed that Ruggy no longer wants to spend prolonged periods of time outside, going out only to relieve himself, and then asking to be let back inside.

144. In addition to harms related to the persistent noise, Mr. Polito is concerned about the potential health risks associated with the increase in local air pollution due to the facility's 24/7 operation, including but not limited to the discharge of PM2.5 emissions.

145. Mr. Polito also has incurred out-of-pocket losses due to Digi Power's operations. Because he cannot open his windows due to the noise, he must run the air conditioner more frequently throughout the year and constantly during summer months, resulting in greater costs and increased wear and tear on his air conditioning unit. He also has reason to believe that Digi

Power's electricity-intensive operations have caused his and other residents' utility bills to increase.

146.    Mr. Polito also has reason to believe that the value of his home has significantly decreased due to the presence of the Digi Power facility and the inescapable and unbearable noise that penetrates the windows and walls of his home. He likewise has reason to believe that his home value has decreased due to the stigma of living near such a facility.

147.    In Mr. Polito's words: "My family and I are under attack. We have been denied the peace and tranquility and comfort of life in our own homes. Most people retreat to the comfort of their homes to shut the world out. Digi Power has invaded our homes, the one and only safe haven we call home to enjoy the pleasures of life."

## CLASS ACTION ALLEGATIONS

148.    Plaintiffs incorporate the foregoing paragraphs as though the same were set forth at length herein.

149.    Plaintiffs bring this lawsuit as a class action on their own behalf and on behalf of all other persons similarly situated as members of the proposed classes pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), (b)(3), and/or (c)(4). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

150.    Plaintiffs bring this class action on behalf of the following classes, as set forth below:

   a.   All individuals residing on property located within 3 miles of Digi Power's Facility from 2021 to the present.

33

b.  All individuals who own and/or owned real property located within 3 miles of Digi Power's Mining Facility from 2021 to the present.

151.    Excluded from the classes set forth above are: (a) Defendant, any entity or division in which Defendant has a controlling interest, and its legal representatives, officers, directors, assigns, and successors; (b) the Judge, Magistrate Judge, and other judicial officer to whom this case is assigned and such Judges' staff, and members of their family; (c) any class counsel or their immediate family members; and (d) the legal representatives, successors, and assigns of any such excluded persons.

152.    Plaintiffs reserve the right to amend the class definitions set forth above if discovery and/or further investigation reveals that any class should be expanded, divided into subclasses or modified in any way.

153.    The Classes are properly brought and should be maintained as a class action under Rule 23(a), satisfying the class action prerequisites of numerosity, commonality, typicality, and adequacy because:

154.    Numerosity: Class Members are so numerous that joinder of all members is impracticable. Plaintiffs believe that there are hundreds or thousands of individuals in the Class and the Subclasses who are Class Members as described above who have been damaged by Defendant's mining operations.

155.    Commonality: The questions of laws and fact common to the Class Members which predominate over any questions which may affect individual Class Members include, but are not limited to:

a.  Whether Defendant has operated and continues to operate its Mining Facility in a manner causing substantial, unreasonable, and continuing interference with the

Class Members' right of use and enjoyment of their property;

b.  Whether Defendant's Mining Facility operations unreasonably interferes with rights common to the general public;

c.  Whether Defendant was negligent in its design, construction, and operation of the Mining Facility;

d.  Whether Defendant owed any duties to Class Members;

e.  Whether Defendant breached one or more duties to Class Members;

f.  Whether Defendant's actions or inactions were a substantial factor in causing harm to Class Members;

g.  Whether Defendant violated any New York laws or local ordinance, including City of North Tonawanda Code Section 61A-4;

h.  Whether Defendant knew or should have known that constant industrial noise and vibration from its operations can cause serious stress, anxiety, and sleep disturbance among the Class Members; and

i.  What is the proper measure of damages incurred by, and injunctive relief available to, the Class Members.

156.  Typicality: Plaintiffs are members of the Class. Plaintiffs' claims are typical of the claims of each Class Member in that every member of the Class and Subclasses was harmed by Defendant's mining operations. Plaintiffs are entitled to relief under the same causes of action as the other Class Members.

157.  Adequacy: Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the Class Members they seek to represent, they have a strong interest in vindicating their rights and the rights of the Class and Subclasses, they have retained

35

counsel competent and experienced in complex class action litigation, and counsel intends to vigorously prosecute this action and has the financial resources to do so. Neither Plaintiffs nor their counsel have interests adverse to the classes.

158.   Predominance: Pursuant to Rule 23(b)(3), the common issues of law and fact identified above predominate over any other questions that may affect only individual members of the Class and Subclasses. The facts and the legal theories regarding Defendant's wrongful conduct are substantially the same for Plaintiffs and all of the Class members, and the action is also amenable to a class-wide calculation of damages through expert testimony applicable to anyone in the Class.

159.   Superiority: A class action is superior to the other available methods for the fair and efficient adjudication of this controversy because:

  a.   The joinder of hundreds or thousands of individual Class Members is impracticable, cumbersome, unduly burdensome, and a waste of judicial and/or litigation resources;

  b.   The individual claims of the Class Members may be relatively modest compared with the expense of litigating the claims, thereby making it impracticable, unduly burdensome, and expensive – if not totally impossible – to justify individual actions;

  c.   When Defendant's liability has been adjudicated, all Class Members' claims can be determined by the Court and administered efficiently in a manner far less burdensome and expensive than if it were attempted through filing, discovery, and trial of all individual cases;

  d.   This class action will promote orderly, efficient, expeditious, and appropriate

adjudication and administration of Class claims;

e. Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action;

f. This class action will assure uniformity of decisions among Class Members;

g. The Class is readily definable and prosecution of this action as a class action will eliminate the possibility of repetitious litigation;

h. Class Members' interests in individually controlling the prosecution of separate actions is outweighed by their interest in efficient resolution by single class action; and

i. It would be desirable to concentrate in this single venue the litigation of all Class Members who were harmed by Defendant's mining facility.

160. Accordingly, these Classes are properly brought and should be maintained as a class action under Rule 23(b)(3) because questions of law or fact common to Class Members predominate over any questions affecting only individual members, and because a class action is superior to other available methods for fairly and efficiently adjudicating this controversy.[60]

161. In addition to the above, Plaintiffs bring an action under Rule 23(b)(2) because Defendant has acted or refused to act on grounds that apply generally to the class, such that final injunctive relief or declaratory relief is appropriate with respect to the Class as a whole. Such injunctive relief includes, but is not limited to, an injunction limiting or preventing Defendants from engaging in the ongoing harmful practices in its operations detailed herein; and an injunction to establish a medical monitoring program sufficient to monitor class members' health to ensure early detection of and adequate protection from the deleterious health effects linked to exposure

---

[60] Plaintiffs reserve the right to amend or modify the Class definition as this case progresses.

to chronic noise such as that produced by Defendants' mining operations. Finally, Plaintiffs and the Class seek a declaration that Defendant acted with negligence, gross negligence, and/or willful, wanton, and careless disregard for the health and wellness of Plaintiffs and members of the Class.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### PRIVATE NUISANCE

162.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

163.    Plaintiffs all own, lease, occupy or control the properties on which they reside, all of which are located near Defendant's Mining Facility.

164.    Defendant, through the negligent, reckless and/or intentional acts and omissions alleged herein, has operated and continues to operate its Mining Facility in a manner causing substantial, unreasonable, and continuing interference with each Plaintiff's private right of use and enjoyment of their properties.

165.    Due to Defendant's operation of its Mining Facility, Plaintiffs have been exposed to constant loud, persistent, and low-frequency noise and vibrations emanating from Defendant's industrial cooling fans and ASIC computer arrays.

166.    The intensity, duration, and character of these noises are such that a reasonable person of ordinary sensibilities residing in the community would consider them an excessive and unreasonable disturbance.

167.    While North Tonawanda was once home to a robust wildlife population that Plaintiffs enjoyed observing, Plaintiffs have seen less wildlife in the area since the Mining Facility began its operations. Plaintiffs have also noticed that their pets no longer enjoy spending time

38

outdoors.

168.    Plaintiffs cannot comfortably sleep, rest, converse outdoors, or enjoy the quiet use of their homes because of the constant mechanical hum, droning, and vibration emitted by Defendant's equipment.

169.    Moreover, such noise exposures contribute to potentially severe health consequences ranging from emotional distress to elevated stress hormones and blood pressure to cardiovascular disease. Nighttime noise exposure is thought to be especially harmful to human health.

170.    Yet Plaintiffs cannot seek reprieve from such exposures by retreating to their homes. Defendant's noise is omnipresent and inescapable, penetrating the walls of Plaintiffs' homes and shattering the peace and quiet previously present in Plaintiffs' lives.

171.    Defendant knew or should have known that the facility's design and 24-hour operations would emit a continuous industrial noise incompatible with adjacent residential neighborhoods.

172.    Despite repeated complaints from Plaintiffs and other residents, and express admonitions by city officials and courts to abate the disturbance, Defendant failed and refused to adopt adequate noise-control measures.

173.    As a direct and proximate result of Defendant's acts and omissions, Plaintiffs have suffered and will continue to suffer loss of enjoyment and use of their property, annoyance, emotional distress, physical discomfort, health harms, and diminution in property value. Defendant's conduct has violated each Plaintiff's private right to the use and enjoyment of their real property.

174.    The nuisance is continuing in nature and causes new and ongoing injury each day

that the facility operates.

## SECOND CAUSE OF ACTION

### PUBLIC NUSIANCE

175.　Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

176.　Defendant's conduct constitutes a public nuisance because it unreasonably interferes with rights common to the general public, including the right to health, safety, and peace.

177.　Pursuant to Article 1, Section 19 of the New York State Constitution, Defendant's operations interfere with the public right to a "healthful environment" by, *inter alia*, emitting excess carbon dioxide emissions resulting from the bitcoin mine's outsized energy demand; diminishing regional biodiversity by disrupting ecosystems with pervasive noise; and causing noise pollution that increases the public risk of disease development.

178.　Defendant's operations have also materially impaired the public's right to quiet enjoyment of their environment and have endangered public health and welfare.

179.　The continuous and excessive noise and vibration emitted from the facility have affected the public rights of a substantial number of residents in the surrounding neighborhood.

180.　Plaintiffs have suffered special injury distinct from that of the public at large because Plaintiffs have experienced diminution of property value due to the proximity of their homes to Defendant's operation. While a substantial number of individuals have been adversely affected by Defendant's conduct, Plaintiffs' injuries are unique in that Defendant's violations of public rights have directly and measurably reduced the market value of Plaintiffs' properties.

181.　Additionally, as a result of their proximity to Digi Power's Mining Facility, Plaintiffs have suffered physical manifestations of harm distinct from injuries experienced by the

general public. Although many community members may be affected by increased air pollution and general noise disturbance, the continuous, excessive noise and vibrations emanating from the Mining Facility have caused Plaintiffs to suffer from anxiety, increased stress, loss of sleep, headaches, and other related health effects. Such manifestation of physical harm constitutes an injury different in kind – and not merely in degree – from the generalized unreasonable interference with public rights experienced by the broader community.

182. Defendant has failed to abate the nuisance despite knowledge of the harms caused and repeated notice from residents and city officials.

### THIRD CAUSE OF ACTION

### NEGLIGENCE

183. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if set forth at length herein.

184. Defendant knew or reasonably should have known that its 24/7/365 cryptocurrency-mining operation would emit continuous, high-level noise and vibrations into the surrounding neighborhood, and that chronic exposure to such noise and vibration is a recognized hazard to human health and the environment requiring appropriate mitigation. Research shows that prolonged exposure to elevated ambient noise can trigger a chronic stress response, disrupt sleep, impair cardiovascular function, and degrade quality of life.

185. Defendant further knew or reasonably should have known that it was unreasonable and unsafe to locate and operate such a facility in a predominantly residential area without implementing robust noise-and vibration-abatement measures.

186. Defendant further knew or reasonably should have known that its operations, in fact, caused serious disturbance in the community and violated applicable local noise ordinances

41

and zoning provisions.

187.    Defendant owed Plaintiffs a duty to exercise reasonable care in the design, construction, and operation of its cryptocurrency-mining facility, so as not to inflict foreseeable harm to neighboring residents.

188.    Defendant breached that duty by:

a.    Misrepresenting to public officials and the community, including in public presentations and in its SEQR forms, that no noise would be audible outside the facility;

b.    Failing to implement effective noise-control or vibration-mitigation measures, despite repeated complaints from community members, notice from public officials, and direct admonitions from the New York State Supreme Court;

c.    Operating the facility continuously around the clock in a residential area in a manner that Defendant knew or should have known would disrupt residents' sleep, impair wellbeing, and degrade the surrounding environment; and

d.    Continuing normal operations despite confirmed ordinance violations, documented and reported community harm, and knowledge of those conditions.

189.    Defendant's breach of duty was the direct and proximate cause of Plaintiffs' injuries, which include, but are not limited to, sleep disturbance, heightened stress, annoyance, emotional distress, impaired enjoyment of property, and other adverse health effects.

190.    Moreover, by exposing Plaintiffs – including elevated-risk groups such as infants, children, and the elderly – to sustained noise and vibration, Defendant has caused and continues to cause injury at a physiological level, including elevated stress-hormone levels, disruption of restorative sleep cycles, raised blood pressure, and increased risk of cardiovascular or metabolic

dysfunction.

191.    As a result of Defendant's breaches of the various duties set forth above, Plaintiffs have suffered and continue to suffer damages including, *inter alia*, diminished property value, loss of use and enjoyment of their properties, emotional and mental distress, physical discomfort, and exposure to persistent environmental noise pollution that is linked to known health harms.

**FOURTH CAUSE OF ACTION:**

**NEGLIGENCE PER SE, VIOLATION OF CITY OF NORTH TONAWANDA CODE SECTION 61A-4**

192.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

193.    Section 61A-2 of the North Tonawanda City Code declares it to be the policy of the City "to prevent excessive, unnecessary or unusually loud noise" in order to "preserv[e], protect[] and promot[e] the public health, comfort, convenience, safety, welfare and prosperity and the peace and quiet of the City of North Tonawanda and its inhabitants."

194.    Section 61A-4(A) of the Code prohibits any person from making, continuing, or causing to be made "any sound which a) endangers or injures the safety or health of humans or animals; or b) annoys or disturbs a reasonable person of normal sensitivities; or c) endangers or injures personal or real property."

195.    Section 61A-4(B)(1) makes it unlawful for any person to "operate or cause to be operated on private property any source of sound in such a manner as to create a sound level which exceeds the limits set forth in Table 1 [set forth below] for any receiving property within the land use district when measured at or within the property boundary of the receiving property."

| Receiving Land Use Category | Time | Sound Level Limits | |
|---|---|---|---|
| | | dBA Fast Lmax | dBC Fast Lmax |
| Residential or public space | 7:00 AM – 10:00 PM | 55 | 60 |
| | 10:00 PM – 7:00 AM | 50 | 50 |
| Commercial | 7:00 AM – 10:00 PM | 60 | 65 |
| | 10:00 PM – 7:00 AM | 55 | 60 |
| Industrial | 7:00 AM – 10:00 PM | 65 | 70 |
| | 10:00 PM – 7:00 AM | 65 | 70 |

196.    Additionally, § 61A-4(B)(2) provides that "[f]or any source of sound which emits a pure tone or impulsive sound, the maximum sound level limits set forth in Table 1 shall be reduced by five dBA and five dBC respectively."

197.    Defendant's operation of its cryptocurrency mining facility has repeatedly caused cause sound in violation of § 61A-4(A) because it endangers or injures the safety or health of humans or animals; annoys or disturbs a reasonable person of normal sensitivities; and endangers or injures personal or real property.

198.    As detailed above, residents including Plaintiffs are no longer able to spend time in their yards or on their decks; no longer able to open their windows and doors to get fresh air or cool their homes; no longer able to relax inside of their homes because the sound and vibrations penetrate the walls; and no longer able to sleep well due to the inescapable disruption of the noise. The noise from Defendant's operation has and continues to annoy and disturb residents, including Plaintiffs; causes harm to their mental and physical health; and diminishes their property value.

199.    Defendant's operation of its Mining Facility also exceeded permissible decibel levels set forth under § 61A-4(B), as confirmed by measurements taken by the North Tonawanda Police Department and the Noise Pollution Clearinghouse in 2024.[61]

---

[61] North Tonawanda amended its noise ordinance as of February 17, 2026. Plaintiffs note that Defendant was also in violation of the prior noise ordinance pursuant to former § 61A-4(A), which prohibited "any unreasonable noise", defined in § 61A-3 as "[a]ny excessive or unusually

200.    Additionally, § 61A-5 sets forth specific prohibitions and declares certain acts to be unlawful. Section 61A-5(2) states that "[n]o person shall allow on any property or premises owned, leased, or managed by him the creation, continuance or maintenance of any noise disturbance, or allow the installation, use or operation of any noise source that violates or fails to comply with any section of Chapter 61A."

201.    By maintaining a noise disturbance and operating a noise source that fails to comply with § 61A-4, Defendant has engaged in prohibited acts under § 61A-5, in violation of the City Code.

202.    Plaintiffs are within the class of persons the ordinance was enacted to protect: residents of the City of North Tonawanda whose health, safety, comfort, welfare and peace depend on the control of unreasonable noise.

203.    The injuries Plaintiffs have suffered, including loss of sleep, emotional distress, hearing impairment, and interference with the use and enjoyment of property, are precisely the type of harm the ordinance seeks to prevent.

204.    Defendant's violation of § 61A-4 and § 61A-5 constitutes negligence per se, establishing breach of duty as a matter of law.

205.    Defendant's violation directly and proximately caused Plaintiffs' injuries and damages as described herein.

**FIFTH CAUSE OF ACTION**

**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

---

loud sound or any sound which either annoys, disturbs, injures or endangers the comfort, repose, health, peace or safety of a reasonable person of normal sensitivities or which causes injury to animal life or damage to property or business"; and that Defendant's operations also exceeded the permissible decibel levels set forth under former § 61A-5.

206.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

207.    Defendant's reckless and negligent operation of its Mining Facility in a residential area has exposed Plaintiffs to an unreasonable risk of bodily harm and emotional injury as detailed above.

208.    Defendant knew or should have known that constant industrial noise and vibration from its operations can cause severe stress, anxiety, and sleep disturbance among nearby residents.

209.    Defendant's conduct endangered Plaintiffs' physical safety and health by subjecting them to chronic noise-related stress and sleep deprivation.

210.    As a direct and proximate result of Defendant's negligence, Plaintiffs have suffered severe emotional distress, including irritability, anxiety, increased stress, sleep disturbance, and reduced quality of life.

211.    Plaintiffs' distress is serious, verifiable, and supported by scientific evidence linking chronic environmental noise exposure to health harms, including harms to emotional wellbeing.

## DAMAGES SOUGHT BY THE CLASS

212.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

213.    Plaintiffs and the class have sustained, and will continue to sustain, damages to their health, wellness, and property as a result of Defendant's actions. As a result, Plaintiffs and the class seek monetary damages for each violation of the First through Fifth Claims for Relief. In particular, Plaintiffs and the class seek monetary damages to compensate class members for, *inter alia*, mental anguish and emotional distress, disruption to the use and enjoyment of their property, and violation of their private and public rights caused by Defendants mining operation. Plaintiffs

46

further seek damages to compensate Plaintiffs and class members for diminution in value of their property caused by Defendant's conduct, including the stigma tainting their neighborhood due to Defendants operations therein.

214. Plaintiffs and the class also seek consequential damages sufficient to fund a medical monitoring program that is reasonably tailored to the risks posed by chronic exposure to noise of the character and intensity to which Plaintiffs are exposed due to Defendant's operations.

215. Further, because Defendant's acts were done maliciously, oppressively, deliberately, and in reckless disregard of Plaintiffs and the class, Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

216. In addition to the above, Plaintiffs and the class seek injunctive relief to abate the nuisance in a manner to be determined by experts. Plaintiffs further seek injunctive relief to establish a medical monitoring protocol for class members to monitor their health and diagnose at an early stage any ailments associated with exposure to noise at the intensity and character of that emitted by the facility.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court:

a) Certify the Class with Plaintiffs appointed as Class representatives and the undersigned appointed as Class counsel;

b) Enter a judgment in favor of Plaintiffs on all claims;

c) Award actual, compensatory, statutory, and consequential damages, along with punitive, treble or other multiple damages, including damages for personal injuries, damage to the health of their pets; damages for diminution in property value, according to proof; damages for loss of the use and benefit of Plaintiffs' real and/or personal property; and general damages for fear, worry, annoyance, discomfort, disturbance, inconvenience, mental anguish, emotional distress, and loss of quiet enjoyment of property;

d) Direct Defendant to disgorge all amounts obtained in connection with or

as a result of the violations of law alleged herein;

e)     Grant injunctive relief for the creation of a medical monitoring fund sufficient to cover past and future medical expenses necessary to monitor for disease and illness likely to occur as a result of Defendants' actions and to cover incidental expenses according to proof;

f)     Enter an immediate temporary injunction against Defendant to prevent further harm to Plaintiffs;

g)     Grant an award to Plaintiffs for punitive and exemplary damages according to proof;

h)     Award Plaintiffs the costs of this action, including reasonable attorneys' fees and expenses and expert fees, as allowed by law;

i)     Award pre-judgment and post-judgment interest at the highest rate allowed by law; and

j)     Award such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: April 6, 2026          Respectfully submitted,

**WEITZ & LUXENBERG, PC**

By:     */s/ James Bilsborrow*
James Bilsborrow
Emma Dietz*
Robin Greenwald*
Devin Bolton
Robert Quigley
700 Broadway, 5th Fl.
New York, NY 10003
Phone: (212) 558-5500
jbilsborrow@weitzlux.com
edietz@weitzlux.com
rgreenwald@weitzlux.com
dbolton@weitzlux.com
rquigley@weitzlux.com

*to seek admission *pro hac vice*

*Attorneys for Plaintiff*

48